UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRETT CLIFTON ROUBIDEAUX,<br><br>Defendant. | 3:23-CR-30029-RAL<br><br><br>REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS |

In this burglary case, Brett Clifton Roubideaux seeks to suppress evidence seized during the search of a residence and statements he made after his arrest. Roubideaux asserts that the officers did not have consent to enter the dwelling and that the evidence garnered from it and his post-arrest statements were the fruit of an illegal search. He also asserts that his statements were made involuntarily. Because Roubideaux was at least an overnight guest (which the government concedes) and the arresting officer lacked consent to be in the home, the Court recommends the jacket and backpack seized inside be suppressed. And because his statements were tainted by the initial illegal search (and therefore inadmissible for all purposes), the Court recommends that Roubideaux's suppression motion be granted.

1

## BACKGROUND

On January 25, 2023, someone broke into the Sicangu Youth and Family Services building in Mission, South Dakota. Surveillance cameras captured the break-in. Rosebud Sioux Tribe Special Agent Richard Kumley reviewed the video footage the next day and noted the suspect, wore gray shoes with white soles, and had on a red plaid jacket under a black sweatshirt. Kumley observed the suspect in the video take items from the building including a cart, monitor screen, television, and a FILA brand backpack.

That same day (January 26), Rosebud Sioux Tribe Sergeant Samuel Antoine received a photograph, which depicted a man wearing a red plaid jacket, gray shoes, and a backpack pushing a woman in a wheelchair near the commodity building in Mission. The two individuals were identified as Roubideaux and June One Star respectively. When reviewing the photograph, Kumley noticed that the clothing matched what the suspected burglar had on in the footage he had just watched. Kumley also recognized June in the photograph as he had responded to the car accident she was part of that left her using a wheelchair. Armed with this information, Kumley traveled to the South Antelope community in Mission to look for Roubideaux and June.

Kumley stopped and parked at Connie One Star's house where he believed June was residing. Kumley had been to the home several times before to address reports of violence. As he approached the split-level home, Kumley observed a person looking at him through one of the windows. Kumley knocked on the front door. Roman Small

opened the door and greeted Kumley. Small stood inside, adjacent to the door, and June sat, in her wheelchair, at the top of the stairs. The entryway was small and had stairs leading up and downward.

While standing just outside the front door of the house, Kumley informed Small and June that he and the officers with him were looking for Roubideaux. June at first claimed Roubideaux was not at the residence. Kumley advised her that he was not there to arrest Roubideaux and just needed to speak with him. Mindful of where Roubideaux was at the time, June asked if Kumley wanted to talk to Roubideaux. Kumley said he did, and demanded to do so right away. Moments later, Roubideaux appeared at the stair crest. Upon seeing him, Kumley thought he fit the description of the burglary suspect and had the same gray and white soled shoes on.

Kumley instructed Roubideaux to "come over here." In response, Roubideaux started down the stairs but stopped. Contemporaneously, Kumley stepped inside the residence and stood against the opened front door. There, he began questioning Roubideaux, who remained on the stairs. Kumley then grabbed Roubideaux, dragged Roubideaux down the stairs, and arrested him with help from Antoine and Rosebud Sioux Tribe Officer Jeremi Blacksmith. Antoine and Blacksmith put Roubideaux in the back of Blacksmith's patrol vehicle. Kumley remained in the dwelling and proceeded up the stairs and conversed with June and Connie.

While upstairs, Kumley saw and seized a red plaid jacket that looked like the one from the break-in footage. At some point, June went into the bedroom she and Roubideaux shared. Kumley followed her and entered the room. As June was moving things around in the room, Kumley spotted and confiscated a backpack that appeared to be the same as the one stolen from the January 25 burglary.

Kumley interviewed Roubideaux the ensuing morning (January 27) at the tribal jail. During the interview, and after being *Mirandized*, Roubideaux made incriminating statements.

A federal grand jury subsequently indicted Roubideaux and charged him with third-degree burglary.[1] He moved to suppress the evidence seized from Connie's residence and the statements he made to Kumley during the jail interview.[2] The government opposed the motion.[3]

## DISCUSSION

### A. Home Entry and Search

Roubideaux asserts that the warrantless entry into Connie's house and the seizure of the jacket and backpack inside it breached the Fourth Amendment.[4] Roubideaux maintains, and the government does not dispute, that he was at least an overnight guest

---

[1] *See* 18 U.S.C. § 1153; S.D. Codified Laws § 22-32-8.
[2] Docket Nos. 29, 30.
[3] Docket No. 31.
[4] Docket No. 30 at 4-6.

4

and had a reasonable expectation of privacy in the residence.[5] As Roubideaux sees it, no one consented to Kumley entering and remaining within the dwelling.[6] Kumley had implied consent, the government counters, and was lawfully in the home.[7]

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."[8] Thus, "[w]arrantless searches of a person's home are generally prohibited under the Fourth Amendment unless an exception to the warrant requirement applies."[9] One such exception is valid consent, which is determined by the totality of the circumstances, and requires the consent to be "freely and voluntarily given, and not the product of implicit or explicit coercion."[10] "The government bears the burden of proving voluntary consent."[11] Valid consent can be obtained from a homeowner,[12] or a fellow occupant who shares common authority over the property with another, absent, person.[13] The consent exception even extends to entries and searches with the permission of a person the police reasonably, but erroneously, believe to possess shared authority as an occupant.[14]

---

[5] *Id.*; Suppr. Hr'g Tr. 5 (Aug. 10, 2023).
[6] Docket No. 30 at 4-6.
[7] Docket No. 31 at 8-10.
[8] *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotations omitted).
[9] *United States v. Hayes*, 75 F.4th 925, 927 (8th Cir. 2023) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).
[10] *United States v. Rambo*, 789 F.2d 1289, 1296 (8th Cir. 1986).
[11] *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011).
[12] *See Fernandez v. California*, 571 U.S. 292, 299 (2014); *Schneckloth v. Bustamante*, 412 U.S. 218, 222 (1973).
[13] *See United States v. Matlock*, 415 U.S. 164, 170 (1974).
[14] *See Rodriguez*, 497 U.S. at 186.

"[C]onsent may be express or implied."[15] "[It] may be inferred from the defendant's 'words, gestures, or other conduct,' and the ultimate inquiry is not whether the defendant subjectively consented, but whether 'a reasonable officer would believe consent was given.'"[16] The standard for measuring the scope of "consent under the Fourth Amendment is that of 'objective' reasonableness[.]"[17]

The precise question is not whether Roubideaux or any other occupants consented subjectively, but whether any of their conduct would have caused a reasonable person to believe they had consented to the entry and search of the residence.[18]  Based on the evidence and testimony presented, the Court concludes nothing the occupants said or did would have engendered such a belief.

Small, who opened the front door, did not invite Kumley into the residence. Kumley remained outside as he spoke first with Small and then to June. Right after Kumley told June he was there to talk to Roubideaux and not arrest him, Roubideaux appeared at the top of the stairs near June.[19]

Once in sight, Kumley directed Roubideaux to "[c]ome over here" and asked if they could talk "real quick."[20] Roubideaux replied, "yeah," and descended a few stairs

---

[15] *United States v. Rodriguez*, 834 F.3d 937, 940 (8th Cir. 2016) (citations omitted).
[16] *Id.* (quoting *United States v. Pena–Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)).
[17] *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citing *Rodriguez*, 497 U.S. at 183-89).
[18] *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001).
[19] Suppr. Hr'g Ex. 6 at 15:12:36-15:12:38, 15:13:27-15:13:42 (Aug. 10, 2023); Suppr. Hr'g Tr. 28-29.
[20] Suppr. Hr'g Ex. 6 at 15:13:42-15:13:45.

before stopping.[21] About the same time, Kumley entered the house and asked if he and Roubideaux could "talk in private."[22] Roubideaux answered, "No. They [the other occupants] can hear whatever."[23] Kumley stayed in the entryway, with his back against the door, and began to question Roubideaux about break-ins.[24] Kumley then requested to search the residence, which Roubideaux denied until Kumley had a search warrant.[25]

Kumley showed Roubideaux a photograph. Roubideaux thought the person in the photo was a man named "Dallas."[26] Unconvinced, Kumley grabbed Roubideaux, who was still standing on the stairs, pulled him out of the house, and arrested him.[27] As Kumley did so, Roubideaux communicated that Kumley did not have a search warrant.[28] Antoine and Blacksmith put Roubideaux in the back of Blacksmith's vehicle while Kumley lingered in the residence and spoke with Connie and June, who were still upstairs.[29]

June expressed concern as Roubideaux was arrested and taken out of the house.[30] While the two other officers were busy with Roubideaux, Kumley proceeded into the

---

[21] *Id.* at 15:13:45-15:13:47.
[22] *Id.* at 15:13:48-15:13:50.
[23] *Id.* at 15:13:50-15:13:52.
[24] *Id.* at 15:13:53-15:14:10.
[25] *Id.* at 15:14:12-15:14:26.
[26] *Id.* at 15:15:25-15:15:30.
[27] *Id.* at 15:15:37-15:16:10.
[28] *Id.* at 15:15:42-15:15:44.
[29] *Id.* at 15:16:10-15:17:25; Suppr. Hr'g Tr. 33.
[30] Suppr. Hr'g Tr. 33.

7

house and up the stairs to where June and Connie were located.[31] While on the upper level, Kumley caught sight of a red plaid jacket and held it up for Antoine, who had just returned, to see.[32] Meanwhile, June went into her bedroom and started rummaging about through clothes and other items.[33] Kumley and Antoine quickly joined June in the bedroom entering it without her approval.[34] There, Kumley observed a backpack and seized it.[35]

When questioned, Kumley admitted he did not receive express consent from anyone to enter or be in the house.[36] The government though argues Kumley had implied consent.[37]

Courts in the Eighth Circuit have consistently held that an officer can reasonably imply consent from an individual stepping back from or to the side of a door.[38] But none

---

[31] *Id*. at 33-34.
[32] Suppr. Hr'g Ex. 6 at 15:17:25-15:17:30; Suppr. Hr'g Tr. 36.
[33] Suppr. Hr'g Tr. 37-38.
[34] *Id*. at 38; Suppr. Hr'g Ex. 6 at 15:17:54-15:18:15.
[35] Suppr. Hr'g Ex. 6 at 15:17:54-15:18:15.
[36] Suppr. Hr'g Tr. 66-67, 74-75.
[37] Docket No. 31 at 8-10.
[38] *See United States v.* Faler, 832 F.3d 849, 852-53 (8th Cir. 2016) (stepping aside, after officers asked if they could come in, implied consent); *United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010) ("[W]hen [defendant] opened the door to the porch and stepped back, he impliedly invited the officers to enter."); *United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) ("[T]he action of [defendant] in the opening of the door and stepping back constituted an implied invitation to enter."); *United States v. Mitchell*, Case No. 4:21-CR-40008-01-KES, 2021 WL 3769809, at *1 (D.S.D. Aug. 25, 2021), *aff'd*, 55 F.4th 620 (8th Cir. 2022) (occupant's "stepping to the side of the doorway 'would have caused a reasonable person to believe' he consented to the officers' entry[.]"); *but see United States v. Serabia-Ferrel*, Case No. CRIM. 11-174 DSD/FLN, 2011 WL 3625140, at *1-3 (D. Minn. Aug. 17, 2011) (no implied consent found when defendant and third-party opened front door to find seven officers on their doorstep, some of whom were in SWAT gear brandishing assault rifles; after officers asked twice to enter, pair wordlessly stepped away from door).

of the implied consent cases involved an officer who entered a dwelling only after ordering the suspect to "come over here."

Kumley claims that he had implied consent to meet "in the middle" because Roubideaux "was coming towards me,"[39] and because "at no point [did] [anyone] ask[] me to leave the residence."[40] Roubideaux's movements in Kumley's direction though were in direct response to Kumley's order and not a voluntary act of convergence.[41] And the failure to object to Kumley's entry into the home or to request him to leave is not tantamount to consent.[42]

*Rodriquez*, a case the government relies on,[43] is distinguishable. Unlike the defendant in that case, Roubideaux did not answer the door, immediately turn around, and hold the door open for officers after they asked if they could "step in and talk real quick."[44] Instead, Roubideaux started for the door only after hearing Kumley's "come over here" instruction. Kumley could have spoken with Roubideaux from outside the house—as he did with June—and not crossed the threshold and entered.[45] Significantly,

---

[39] Suppr. Hr'g Tr. 75.
[40] *Id.* at 76.
[41] Suppr. Hr'g Ex. 6 at 15:13:45-15:13:50.
[42] *See Bashir v. Rockdale Cnty, Ga.*, 445 F.3d 1323, 1329 (11th Cir. 2006) (consent cannot reasonably be inferred from defendant's failure to object once officer inside home); *Roe v. Texas Dept. of Prot. and Regul. Servs.*, 299 F.3d 395, 402 (5th Cir. 2002) ("[s]ilence or passivity cannot form the basis for consent to enter"); *United States v. Shaibu*, 920 F.2d 1423, 1427-28 (9th Cir. 1990) (consent not implied merely because no objection made to officers entering apartment's front door).
[43] Docket No. 31 at 10.
[44] *Rodriguez*, 834 F.3d at 939.
[45] Suppr. Hr'g Tr. 79 (Q: "[W]hile you were standing outside, you could have spoken with [Roubideaux] when he's halfway down the stairs just as easily as you spoke with June when she was at the top of the stairs, right?" A: "Correct").

Roubideaux did not want to talk in private and expressly denied Kumley permission to search the residence without a search warrant.[46] Kumley could not reasonably believe he had consent to come in when no one said or did anything to create such a belief and Roubideaux insisted on a warrant.[47] The totality of the circumstances, accounting for Roubideaux's words, actions, and conduct and those of June and Connie, do not show that Kumley and the officers with him had implied consent to enter the home.[48]

If Kumley did not have consent in the first place, then it follows that he could not remain inside the residence—much less go into other parts of it—after Roubideaux's arrest. Contrary to what the government claims, Kumley was not lawfully present when he observed the plaid jacket and backpack.[49] With neither the consent nor the plain view exception to the warrant requirement available, Kumley's upstairs search, and seizure of the jacket and backpack, violated the Fourth Amendment and should be suppressed.[50]

---

[46] Suppr. Hr'g Ex. 6 at 15:13:49-15:13:51, 15:14:13-15:14:28.
[47] *Rodriguez*, 834 F.3d at 940.
[48] *Id.*
[49] Suppr. Hr'g Tr. 66 (Q: "So you didn't see [the red plaid jacket] when you were standing at the bottom of the stairs?" A: "No." Q: "You only saw [it] after you went to the top of the stairs?" A: "That is correct"); *see United States v. Class*, 883 F.3d 734, 737 (8th Cir. 2018) ("Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993))); *see also United States v. Arredondo*, 996 F.3d 903, 907 (8th Cir. 2021) ("The plain view exception authorizes an officer to seize an object" only if "the officer lawfully arrived at the location from which he or she views the object").
[50] *See Horton v. California*, 496 U.S. 128, 136 (1990) ("[A]n essential predicate to any valid warrantless seizure of incriminating evidence [is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed.").

B.  **Statements**

"Evidence obtained as a direct result of an unconstitutional search or seizure is [] subject to exclusion."[51] The exclusionary rule applies with equal force to derivative evidence of an illegal search, unless the connection between the constitutional violation and the evidence is "so attenuated as to dissipate the taint."[52] The defendant has the burden to make an initial showing that the evidence sought to be suppressed has been tainted by an unconstitutional search.[53] Once he has done so, "the ultimate burden of persuasion to show the evidence is untainted lies with the government."[54]

"[W]hen a confession results from certain types of Fourth Amendment violations (rather than a Fifth Amendment violation), the government must go beyond proving that the confession was voluntary—it must *also* 'show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.'"[55] Although the Supreme Court has never directly addressed the issue, when a suspect is confronted with incriminating evidence police have unlawfully seized, there

---

[51] *Segura v. United States*, 468 U.S. 796, 804 (1984).
[52] *Wong Sun v. United States*, 371 U.S. 471, 487 (1963) (*citing Nardone v. United States*, 308 U.S. 338, 341 (1939)).
[53] *See United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011).
[54] *Id.*
[55] *United States v. Bocharnikov*, 966 F.3d 1000, 1003–04 (9th Cir. 2020) (quoting *Oregon v. Elstad*, 470 U.S. 298, 306 (1985) (emphasis added)); *see also Dickerson v. United States*, 530 U.S. 428, 441 (2000) ("[*Elstad*] recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment"); *United States v. Shetler*, 665 F.3d 1150, 1159–60 & n.4 (9th Cir. 2011) (explaining difference between confessions resulting from Fourth Amendment violations and Fifth Amendment violations); *see generally* 6 Wayne R. LaFave, *Search and Seizure*, § 11.4(c) (6th ed. Oct. 2022 Update).

11

has been an exploitation of that illegality if they subsequently interrogate him about the evidence or the crime to which it relates.[56] When a confession follows an illegal search instead of an unlawful detention, "there are at least two additional considerations."[57] "The first is whether the interrogating officers confronted the suspect with the evidence that was illegally obtained.[58] The second is whether the answers the suspect gave to officers were influenced by his knowledge that officers had already seized certain evidence.[59]

During the post-arrest interview, Kumley used the illegally seized jacket and backpack to elicit inculpatory statements from Roubideaux.[60] Indeed, when Roubideaux said the person in the video surveillance footage was someone else, Kumley brought up the backpack he found in Roubideaux's bedroom.[61] And in the process, Kumley deceptively told Roubideaux that Roubideaux's fingerprints were on the stolen television and that the jacket found in Connie's house and the shoes he had on were the same as those the burglar wore.[62]

---

[56] *See* 6 *Search and Seizure*, § 11.4(c); *see also United States v. Timmann*, 741 F.3d 1170, 1184 (11th Cir. 2013) (when police confronted defendant with evidence they obtained through unlawful search of apartment, his "admissions were the direct result of the officers' 'exploitation' of the unlawful search"); *State v. Betts*, 75 A.3d 629, 642 (Vt. 2013) (where evidence obtained via invalid consent, confession flowed directly from discovery of that evidence and must be suppressed).
[57] *Shetler*, 665 F.3d at 1157.
[58] *Id*. at 1158.
[59] *Id*.; *see also Fahy v. Connecticut*, 375 U.S. 85, 91 (1963) (in reversing state supreme court decision that admission of evidence was harmless error, Court said that "petitioner should have had a chance to show that his admissions were induced by being confronted with the illegally seized evidence").
[60] Suppr. Hr'g Ex. 8 at 6:11-7:38.
[61] *Id.*
[62] *Id*. at 6:11-8:12, 9:23-9:37.

Confronting Roubideaux with evidence illegally obtained from the house, induced him to confess by demonstrating the futility of remaining silent.[63] After Roubideaux tried to pin the blame on a person named "Carl," Kumley used the jacket and backpack to get Roubideaux to admit to being the burglar.[64] Challenged with this evidence, Roubideaux began to cave, asking, "If I tell you, what does this do for me?"[65] A couple of minutes later, he confessed to taking the television, saying he planned to sell it because there was no food in the house.[66] The government has produced no evidence to show that Roubideaux's statements to Kumley were not influenced by, or the product of, the unlawful search. On this record, there is every reason to believe they were.[67]

Nor has the government satisfied its burden of showing that, if the statements stemmed from the invalid search of the dwelling, they were still sufficiently attenuated from the unlawful conduct to be admissible.[68] To determine whether the statements were the "fruit" of a Fourth Amendment transgression or whether they were obtained by "means sufficiently distinguishable to be purged of the primary taint," three factors must be considered: (1) the temporal proximity of the search to the confession; (2) the presence of intervening causes between them; and (3) the purpose or flagrancy of the official

---

[63] *See Shetler*, 665 F.3d at 1158.
[64] Suppr. Hr'g Ex. 8 at 6:11-9:37
[65] *Id.* at 9:38-9:41.
[66] *Id.* at 11:17-12:02.
[67] *Shetler*, 665 F.3d at 1158-59.
[68] *Id.* at 1159.

13

misconduct.[69] Whether officers warned the suspect under the *Miranda* rule is "important," though by no means "dispositive."[70]

Of these factors, the third one is "the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct."[71] Courts have found actionable misconduct where the impropriety of the conduct was obvious and officers knew, at the time, that they were likely violating the suspect's rights and where their conduct was "investigatory in design and purpose and executed 'in the hope that something might turn up.'"[72] An unreasonable mistake, however, is not sufficient by itself to establish flagrant misconduct.[73]

First, only 18 hours elapsed between Roubideaux's arrest and interrogation.[74] Although not hard on the heels of the search, the same officer who made the arrest, searched the house, and seized the jacket and backpack (Kumley), also questioned Roubideaux. There is no reason to believe that the passage of a short period of mostly nighttime winter hours vitiated the causal connection between the home search and Roubideaux's statements, especially given Kumley's use of the jacket and backpack to evoke a confession.[75]

---

[69] *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *Shetler*, 665 F.3d at 1159.
[70] *United States v. Brooks*, 22 F.4th 773, 780 (8th Cir.), *cert. denied*, 142 S. Ct. 2826 (2022).
[71] *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006).
[72] *Id.* (quoting *Brown*, 422 U.S. at 605).
[73] *See id.*
[74] Suppr. Hr'g Exs. 6 at 5:02-5:23, 7, and 8 at 0:03-0:12.
[75] *See* 6 *Search & Seizure*, § 11.4(c) ("the *Brown* 'temporal proximity' factor is of virtually no significance" when evaluating a confession following an illegal search); *Shetler*, 665 F.3d at 1159 (36-hour passage "does

14

Second, there were no intervening circumstances that purged the taint of the unconstitutional violation. Granted, Roubideaux did receive Miranda warnings after the search and before he confessed.[76] But those warnings did not purge the taint of the temporally proximate illegal acts from which his confession was obtained.[77] Warnings are not an elixir for a Fourth Amendment violation; if they were, then police could sidestep the violation by using words from a form.[78] Kumley's illegal entry, arrest, search, and seizures were the direct and proximate cause of Roubideaux's incriminating statements.[79] The Miranda advisement given did not cure Kumley's unconstitutional conduct and his exploitation of that conduct during the January 27 interview.[80]

Lastly, Kumley's uninvited intrusion into the residence and subsequent actions had a quality of purposefulness and flagrancy. Kumley:

1. Announced he was not there to arrest Roubideaux—presumably to get Roubideaux to show himself—and then arrested Roubideaux two minutes after he appeared.[81]

---

not weigh in government's favor" because DEA agents confronted suspect with illegally seized evidence during interview).

[76] Suppr. Hr'g Exs. 8 at 1:50-2:39 and 9; Suppr. Hr'g Tr. 41-43.

[77] *See Brown*, 422 U.S. at 603 ("Miranda warnings, alone and per se, cannot always make the act sufficiently a product of free will [and] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited.").

[78] *Id.* at 602-03 ("Any incentive to avoid Fourth Amendment violations would be eviscerated by making the [Miranda] warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.'").

[79] *See United States v. Duchi*, 944 F.2d 391, 395 (8th Cir. 1991).

[80] *Id.*

[81] Suppr. Hr'g Ex. 6 at 15:12:36-15:15:40; Suppr. Hr'g Tr. 56-57.

2. Stepped into the house when Roubideaux showed himself and commanded him to "[c]ome over here" after talking with Small and June from the outside.[82]
3. Remained in the home, and then searched it, after Roubideaux denied consent and clamored for on a warrant to search.[83]
4. Proceeded further into the residence, after Roubideaux's arrest, without June or Connie's permission.[84]
5. Entered June and Roubideaux's bedroom, accompanied by Antoine, without consent.[85]
6. Interrogated Roubideaux the morning after his arrest.[86]
7. Confronted Roubideaux with the illegally seized jacket and backpack.[87]
8. Misleadingly referred to "having" Roubideaux's fingerprints on the stolen television.[88]
9. Played on Roubideaux's emotions and his desire to be with June and not let her go hungry.[89]
10. Assured Roubideaux that his cash bond "will get knocked way down," which led immediately to him confessing.[90]

Roubideaux's statements flowed from and were tainted by the unlawful search of Connie's house and seizure of items from it. Importantly, Kumley did not have probable cause to arrest Roubideaux until *after* entering the residence.[91] Because of the unbroken

---

[82] Suppr. Hr'g Ex. 6 at 15:12:08-15:13:48; Suppr. Hr'g Tr. 57, 62.
[83] Suppr. Hr'g Ex. 6 at 15:14:23-15:18:38; Suppr. Hr'g Tr. 61-62.
[84] Suppr. Hr'g Ex. 6 at 15:16:10-15:18:14; Suppr. Hr'g Tr. 64-67.
[85] Suppr. Hr'g Ex. 6 at 15:17:53-15:18:14; Suppr. Hr'g Tr. 66-67.
[86] Suppr. Hr'g Ex. 8.
[87] *Id*. at 6:11-8:12.
[88] Suppr. Hr'g Tr. 67-69.
[89] Suppr. Hr'g Ex. 8 10:44-10:57, 12:03-12:55, 14:14-15:06; Suppr. Hr'g Tr. 69.
[90] Suppr. Hr'g Ex. 8 at 10:55-11:22; Suppr. Hr'g Tr. 69.
[91] Suppr. Hr'g Tr. 77 (Q: "Did you have probable cause to enter that home?" A: "Reasonable suspicion." Q: "But not probable cause[?]" A: "No."); *but see New York v. Harris*, 495 U.S. 14, 15, 21 (1990) (exclusionary rule does not bar government's use of voluntary statement made by suspect outside of his home when police have probable cause to arrest suspect *before* entering home in violation of *Payton*); *United States v. Yorgensen*, 845 F.3d 908, 913 (8th Cir. 2017) (applying *Harris* because "officers had probable cause to arrest [suspect] *before* entering his home") (emphasis added).

16

causal chain between the home illegalities and Roubideaux's statements, the statements were not sufficiently an act of free will to purge the primary taint of the officers' unlawful actions. Holding otherwise would motivate the police to violate the Fourth Amendment.[92]

Both parties ask that the Court determine whether the statements Roubideaux made were voluntary.[93] But because his statements were not attenuated from the unlawful entry into the dwelling and the search and seizure of the jacket and backpack inside, there is no need to consider the voluntariness of the statements.[94]

## CONCLUSION

Officers did not have consent to enter or be in Connie's house. Kumley violated Roubideaux's Fourth Amendment rights when he stepped into the home, walked up the stairs of it, and seized the jacket and backpack. These two items should therefore be suppressed.

Kumley also questioned Roubideaux a short time later and used the jacket and backpack to get Roubideaux to admit to the burglary. No intervening circumstances separated the arrest, search, and interview. And Kumley acted purposefully and

---

[92] *See Harris*, 495 U.S. at 20-21.
[93] Docket Nos. 29-31.
[94] *See Elstad*, 470 U.S. at 306 ("prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation" *and* "voluntariness"); *id.* ("a procedural Miranda violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits.").

flagrantly both before and during the interrogation. Roubideaux's statements resulted from the illegal search and seizures at the dwelling and were the unattenuated fruit of the illegality. The statements should likewise be suppressed.

## RECOMMENDATION

Based on the discussion and analysis set forth in this report and the record now before the Court, it is

RECOMMENDED that Roubideaux's motion to suppress[95] be granted and that the jacket and backpack (seized on January 26, 2023) and his statements (made the next day) be excluded for all purposes at trial.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[96] Unless an extension of time for cause is later obtained,[97] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[98] Objections must "identify[] those issues on which further review is desired[.]"[99]

---

[95] Docket No. 29.
[96] *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b).
[97] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).
[98]*See Thompson*, 897 F.2d at 357; *Nash*, 781 F.2d at 667.
[99]*Arn*, 474 U.S. at 155.

DATED this 29th day of August, 2023.

             **BY THE COURT:**

             */s/ Mark A. Moreno*

             **MARK A. MORENO**
             **UNITED STATES MAGISTRATE JUDGE**